**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

              v.                              14-CR-133-A
                                                **DECISION AND ORDER**

GIOVANNI COTTO,

              Defendant.
_____

After a jury trial, the Defendant, Giovanni Cotto, was convicted of one count of retaliating against a witness in an official proceeding, in violation of 18 U.S.C. § 1513(b)(1), § 1513(c), and § 2. The Defendant now moves for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and for a new trial pursuant to Rule 33. For the reasons stated below, both motions are denied.

## BACKGROUND

Because the Defendant was found guilty, the Court recites the evidence "in the light most favorable to the government, with all reasonable inferences drawn in its favor." *United States v. Rowland*, 826 F.3d 100, 105 n.1 (2d Cir. 2016) (quotation marks omitted).

The events giving rise to this case began in the lockup on the ninth floor of the federal courthouse in Buffalo, New York, where the courtrooms of U.S. District Judge William M. Skretny and the undersigned are located. On May 22, 2014, Jose Escalera—who, at the time, was facing narcotics charges before this Court—and Angel Marcial—who was appearing before Judge Skretny—were held together in the ninth floor lockup. Just over one year earlier, Escalera and Marcial had been spent six months in nearly-adjoining cells at the Erie County Holding Center. Escalera and Marcial—both of whom

were members of the Latin Kings gang—would thus have had an opportunity to become acquainted prior to May 22.

Marcial was at the federal courthouse on May 22 because he was a defendant in a murder-for-hire trial before Judge Skretny. One of the witnesses in that trial was Anthony Maldonado. At the time of his testimony, Maldonado was detained in the Cattaraugus County Jail after pleading guilty and agreeing to cooperate with the Government.

Escalera, Maldonado, and a third detainee—Franky Ramos—were taken back to the Cattaraugus County Jail on May 22. Before they left the courthouse, Escalera told Ramos that "some rat is ratting on a big case, or something like that, a death penalty case," in the "federal courthouse." Tr. 270:25 – 271:9. In the transport van, Escalera identified Maldonado for Ramos, saying "that's him right there." Tr. 271:15. Ramos asked Maldonado whether he was a "rat," which Maldonado denied. Tr. 27:3-5. Ramos responded that "that was good because God don't like no rats." Tr. 216:18-19.

Later that day, Ramos told the Defendant what Escalera had told Ramos at the courthouse. Another inmate in the Cattaraugus County Jail, Daniel Colon, overheard the Defendant and Ramos speaking while they were sitting at a table approximately five feet from Colon's cell. The Defendant and Ramos were "talking about" Maldonado and "saying that they know that he went to court today." Tr. 480:8-10. The Defendant then walked to the end of the gallery and called to Maldonado, asking "him if he went to court today." Tr. 481:8-9. Maldonado replied,[1] and the Defendant returned to the table where Ramos was sitting, saying "[t]hat's got to be him." Tr. 482:9-10.

---

[1] The substance of Maldonado's reply is not in the trial record.

The next day, the Defendant approached another inmate, Charles Hecht, in his cell. The Defendant and Hecht had fought each other before and, as a result, the Defendant respected Hecht. The Defendant and Hecht had also "had talks . . . about [Hecht] becoming an honorary member" of the Latin Kings by "fighting, stabbing, moving stuff, sending messages," or other tasks. Tr. 527:12 – 528:1. In exchange for his services, the Defendant told Hecht that he could "get protection and/or things from the Latin Kings" in the New York State prison system, where Hecht anticipated serving a lengthy sentence. Tr. 528:4-8. On the morning of the assault, the Defendant told Hecht that "today was [Hecht's] chance to be able to make that happen." Tr. 527:20-21. The Defendant told Hecht that he "believed that [Maldonado] was a rat" and that "he was going to make sure when we were out in the yard." Tr. 528:21-24. The Defendant concluded by telling Hecht to "make him proud." Tr. 528:24.

At some point that day, Ramos saw the Defendant and Escalera speaking "briefly." Tr. 267:19. Ramos—who had been a member of the Latin Kings in the 1990s, but who had been allowed to leave with "no repercussions" because of his lengthy tenure in the gang, Tr. 253:21-25; 532:10-13—could not remember what the Defendant and Escalera said to each other, but Ramos testified that witnessing the interaction between the Defendant and Escalera is "when [he] found out pretty much that they was . . . Latin King brothers or whatever." 269:8-10. *See also* Tr. 269:21-22 (Q: By what, their words or their gestures or both? A: Their words.)

That afternoon, Escalera had conversations with two inmates in the Jail's classroom. Escalera asked the first inmate, Esteban Ramos-Cruz, to tell the Defendant that Maldonado "was a snitch" who was "testifying against a Latin King." Tr. 410:2-5.

3

Ramos-Cruz refused. Escalera then asked the second inmate, Judson Beattie, to relay the same message. Beattie agreed to do so.[2]

One hour later, the Defendant, Maldonado, Hecht, Colon, and other inmates were in the Jail's recreation yard. Maldonado walked around the perimeter of the yard, while the Defendant "was saying" that Maldonado was "acting different" and "shady," "like he's scared." Tr. 486:5-18.[3] Beattie then told the Defendant that Escalera had said that "there's a person testifying against a higher-up Latin King and he needs something to be done about it." Tr. 529:6-24.

After receiving Escalera's message, the Defendant approached Hecht and "told [him] that it was official." Tr. 533:15. Hecht initially misunderstood the Defendant and "thought that he meant that Maldonado was official, that he wasn't a rat." Tr. 533:16-17. The Defendant clarified that "no, it's true. He's a rat. And fuck him up. Then, [the Defendant] told [Hecht] to make him proud then, too." Tr. 534:8-9.

Less than a minute later, Hecht approached Maldonado and punched him in the head. Maldonado fell to the ground. Hecht then viciously kicked and punched Maldonado, at one point kicking his head into a brick wall. Maldonado's jaw was broken and wired shut for several weeks. After the assault, the Defendant and Hecht high-fived, and the Defendant—who was "pretty much bragging"—told Ramos that Maldonado "deserved to get beat up." Tr. 279:2-18.

---

[2] Beattie testified that Escalera did not ask him to pass on any information. Rather, Beattie testified that he and Escalera discussed "sports [and] females." Tr. 653:25. Because the Court must view the evidence in the light most favorable to the Government, the Court assumes, for purposes of resolving the Defendant's post-trial motions, that Beattie did not testify truthfully regarding his conversation with Escalera.

[3] The events in the recreation yard were captured on a silent surveillance video, which was introduced into evidence.

The Defendant, Escalera, and Hecht were each charged with one count of retaliating against a witness in an official proceeding, in violation of 18 U.S.C. § 1513(b)(1), § 1513(c), and § 2. Hecht pleaded guilty and agreed to testify at trial. Escalera and the Defendant went to trial and were both convicted. The Defendant then filed the Rule 29 and Rule 33 motions that are now before the Court.[4]

## DISCUSSION

### A. The Defendant's Rule 29 motion

#### 1. Standard for judgment of acquittal

Rule 29 imposes a heavy burden on a defendant challenging his conviction following a jury trial. A court may enter a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. In applying these principles, [the Court] review[s] all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quotation marks and citations omitted). In other words, Rule 29 requires that the Court give significant deference to a jury's findings as to "the weight of the evidence and the reasonable inferences to be drawn" from that evidence. *Id.* (quotation marks omitted). This means not only that the Court "must credit every inference that could have been drawn in the government's favor," but that, in assessing the sufficiency of the evidence, the Court "must view the evidence as a whole." *United States v. Applins*, 637 F.3d 59, 76 (2d Cir. 2011). At bottom, "where either of the two results, a reasonable doubt or no reasonable

---

[4] Escalera did not file any post-trial motions.

doubt, is fairly possible, the court must let the jury decide the matter." *Facen*, 812 F.3d at 286 (quotation marks and brackets omitted).

### 2. The Defendant's arguments for judgment of acquittal

The indictment in this case charged the Defendant with violating 18 U.S.C. § 1513(b)(1) by way of 18 U.S.C. § 2. Section 2 contains two subsections—§ 2(a) and § 2(b)—each of which makes one person criminally liable for the acts of another person. The Court instructed the jury that it could find the Defendant guilty under either § 2(a) or § 2(b). The Defendant argues that the evidence is insufficient to sustain his conviction under both sub-sections.

### a. Section 2(a)

Section 2(a)—the aiding and abetting statute—requires the Government to prove that "the underlying crime was committed by someone other than the defendant and that the defendant himself either acted or failed to act with the specific intent of advancing the commission of the underlying crime." *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996). Thus, to prove that the Defendant is guilty under § 2(a), the Government must have proven that the principal—here, Hecht—violated § 1513(b)(1), and that the Defendant aided and abetted Hecht's violation of § 1513(b)(1). This means that the Government must have proven (among other things) that, when he beat Maldonado, Hecht had the intent required by § 1513(b)(1)—that is, the "intent to retaliate against" Maldonado for his testimony in "a proceeding before a judge or court of the United States." 18 U.S.C. § 1513(b)(1); § 1515(a)(1)(A).

The Defendant argues that there is insufficient evidence for a reasonable jury to conclude that Hecht had this intent. The Government's primary response is that, in his

plea agreement, "Hecht admitted all of the essential elements of the crime, including that he was aware the victim was testifying as a witness in federal court." Docket No. 276 at 4.

The factual basis for Hecht's guilty plea would be enough for a reasonable jury to find that Hecht violated § 1513(b)(1), but that factual basis was never read into the record at trial, nor did Hecht admit at trial the facts he admitted to in his plea agreement. Rather, at trial, Hecht only acknowledged "plead[ing] guilty, as charged in the indictment." Tr. 546:12-13. This acknowledgment did not provide the jury with any factual basis to conclude that Hecht had the intent required by § 1513(b)(1).

The Government presented no other evidence from which a jury could reasonably infer that Hecht had the specific intent required by § 1513(b)(1). To be sure, Hecht testified that the Defendant told him that Maldonado was "a rat." Hecht did not, however, testify that the Defendant—or anyone else—told him that Maldonado was testifying in federal court. Indeed, Hecht testified that, when he spoke to the Defendant on May 23, he did not know whether Maldonado "was actually testifying," and he did not "know what case [Maldonado] was testifying in." Tr. 528:22 – 529:5. *See also* Tr. 531:1-9 (Q: And, at the time, as you go out into the yard and decide you're going to assault him, . . . you didn't know that Maldonado was testifying in a federal case? A: No, not yet. I figured because he was going to federal court. Q: You made that assumption? A: Absolutely. Q: But you didn't personally know? A: No.) *Cf. United States v. Bader*, 956 F.2d 708, 710 (7th Cir. 1992) (in sentencing appeal, noting that "[k]nowledge in criminal law is *actual* consciousness") (emphasis in original). Instead, Hecht testified that the reason for the assault (as relayed to him by several co-conspirators) was that "there's a person testifying

against a higher-up Latin King and [Escalera] needs something to be done about it." Tr. 529:22-24. *See also* Tr. 526:4-11 (Q: All right. In the week leading up to Friday, did you speak to [the Defendant] at all about Anthony Maldonado's repeated court trips? A: There was talk about it. I didn't really speak to him, except for like that day, the day of the 23rd. Q: Okay. So, prior to the 23rd, you and defendant Cotto had not had extensive conversations? A: Not about it, no.).

Thus, although there was sufficient evidence for a reasonable jury to find that Hecht beat Maldonado with the intent to retaliate against Maldonado for "testifying against a higher-up Latin King," there was not sufficient evidence for a reasonable jury to conclude that Hecht committed the beating because Maldonado was testifying in federal court.

### b. Section 2(b)

Section 2(b) "adopts the general principal of causation in criminal law that an individual (with the necessary intent) may be held liable if he is a cause in fact of the criminal violation, even though the result which the law condemns is achieved through the actions of innocent intermediaries." *United States v. Concepcion*, 983 F.2d 369, 383-84 (2d Cir. 1992) (quotation marks omitted). Thus, unlike § 2(a), § 2(b) makes "[t]he guilt or innocence of the intermediary . . . irrelevant in determining whether a person charged as a co-principal under [§] 2(b) may be found guilty." *United States v. Ruffin*, 613 F.2d 408, 412, 413 (2d Cir. 1979). This means that the "person who actually performed the act need not have had any criminal purpose or intent." *Concepcion*, 983 F.2d at 384. But a person who "willfully cause[s] an act that, had he performed it directly, would be guilty [of] an offense against the United States" may be guilty under § 2(b), regardless of the third-party's intent. *Id.* In short, § 2(b) provides a way to hold criminally liable a person

who, with the required intent, "causes the commission of an indispensable element of the offence by an innocent agent or instrumentality." *Id.* (quotation marks omitted; emphasis omitted).

These principles mean that the Defendant is guilty under § 2(b) if (1) he willfully caused Hecht to assault Maldonado; and (2) he did so "with the . . . intent" required by 18 U.S.C. § 1513(b)(1). *United States v. Gleason*, 616 F.2d 2, 20 (2d Cir. 1979). In his Rule 29 motion, the Defendant does not contest whether a reasonable jury could have found that he willfully caused Hecht to beat Maldonado. *See* Docket No. 269 at 10 ("[A]ssuming hypothetically that the government's evidence is to be credited, it may be that [the Defendant] committed a crime—aiding and abetting a felony assault, for instance—by soliciting Hecht to beat Maldonado.") Instead, the Defendant argues that there was insufficient evidence for a reasonable jury to find that, in ordering Hecht to beat Maldonado, he had the intent required by § 1513(b)(1). *See id.* at 10-11.

Section 1513(b)(1) makes it a crime to cause bodily injury "with intent to retaliate against any person for . . . any testimony given . . . in an official proceeding." The term "official proceeding" is defined to include "a proceeding before a judge or court of the United States." 18 U.S.C. § 1515(a)(1)(A). Thus, the question here is whether the evidence was sufficient for a reasonable jury to find that, when the Defendant caused Hecht to beat Maldonado, he did so with the "intent to retaliate against" Maldonado for Maldonado's testimony in a "proceeding before a judge or court of the United States." When the Court views the evidence "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government," *Facen*, 812 F.3d at 286 (quotation marks omitted), the Court concludes that the

Government introduced sufficient evidence for a reasonable jury to find that the Defendant intended to retaliate against Maldonado for his testimony in an "official proceeding."

This conclusion is premised on the common-sense notion that "knowledge can be—and usually must be—proved by reasonable inferences drawn from circumstantial evidence." *United States v. Fagan*, 676 F. App'x 16, 17 (2d Cir. 2017) (citing *McFadden v. United States*, 135 S. Ct. 2298, 2306 n.3 (2015)). In other words, it is entirely proper for the jury to have relied on circumstantial evidence to conclude that the Defendant knew that Maldonado was testifying in a federal trial. This conclusion rests largely on two facts.

First, the evidence was more than sufficient for a reasonable jury to conclude that Escalera and Ramos knew that Maldonado was testifying in federal court. A reasonable jury could easily have concluded that Marcial—a defendant in a federal criminal trial—told his friend, Escalera—also a defendant in a federal criminal case—that Maldonado was testifying against him, and that Marcial did so when he and Escalera were both in the federal courthouse in Buffalo on May 22, 2014. On their return trip from federal court, Escalera passed this information to yet another federal inmate—Ramos—who testified that Escalera told him that Maldonado was "ratting on a big case, or something like that, a death penalty case," in the "federal courthouse." Tr. 270:25 – 271:9.[5]

Second, Colon testified that he heard the Defendant and Ramos "talking about" Maldonado and "saying that they know that he went to court today." Tr. 480:8-10. The Defendant confirmed this fact by shouting to Maldonado and asking whether he "went to

---

[5] Ramos testified that, on the day of the assault, he saw Escalera and the Defendant speaking "briefly." Tr. 267:19. Ramos did not testify to the substance of this conversation, but a reasonable jury could have considered the meeting in deciding that the Defendant knew that Maldonado was testifying in federal court.

court today." Tr. 481:8-9. Maldonado replied, and the Defendant returned to the table where Ramos was sitting, saying "[t]hat's got to be him." Tr. 482:9-10. Although Colon—a developmentally-disabled witness who acknowledged that he has memory deficiencies, *see* Tr. 498:1-6—did not testify to the verbatim dialogue between the Defendant and Ramos, when the Court "credit[s] every inference that the jury might have drawn in favor of the government," *Facen*, 812 F.3d at 286 (quotation marks omitted), a reasonable jury could have concluded that the Defendant learned or inferred from Ramos—a federal prisoner who received his information from another federal prisoner—that Maldonado was testifying in the place from which Ramos and Escalera had recently learned their information: a federal court.[6] In other words, a reasonable jury could have inferred that the Defendant learned that Maldonado was testifying in federal court after confirming that [Maldonado] had gone "to court today," a piece of information the Defendant learned from another federal inmate who had returned from the federal courthouse with Maldonado.

Once the jury inferred that the Defendant knew Maldonado was testifying in a federal trial, it would have had little difficulty in reasonably inferring that the Defendant intended to assault Maldonado for his testimony in that trial. The Government introduced strong evidence that the Defendant wanted Maldonado beaten because "[h]e's a rat." Tr. 534:8-9. A reasonable jury could have easily concluded that, once the Defendant learned that Maldonado was testifying in federal court, his intent to retaliate against Maldonado

---

[6] *See United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001) (Sotomayor, J.), *abrogated on other grounds*, *United States v. Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008) ("Circumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime. Such indicia, often accompanied by more general evidence of association, come in a variety of forms. The government may, for example, offer proof of a defendant's knowledge or intent through evidence that the defendant participated in conversations directly related to the substance of the conspiracy.") (citations omitted).

for being "a rat"—an intent that is comfortably supported by the record—transformed into an intent to retaliate against Maldonado for his testimony in a federal trial. *See United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005) ("The law . . . recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom.")

In resolving the Defendant's Rule 29 motion, the Court must evaluate "the totality of the government's case, . . . as each fact may gain color from others." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (citing *United States v. Monica*, 295 F.2d 400, 401 (2d Cir. 1961) (Friendly, J.)). Doing so here, the Government introduced sufficient evidence for "*any* rational trier of fact [to] have found," beyond a reasonable doubt, that the Defendant intended to retaliate against Maldonado for his testimony in a federal trial. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The Government introduced strong evidence that the Defendant directed Hecht to beat Maldonado and that he did so because Maldonado was testifying against another member of the Latin Kings. When that fact is combined with the source of the Defendant's information—two federal prisoners who learned the information after spending the day in a federal courthouse with Maldonado—the jury was presented with enough evidence to reasonably infer that the Defendant intended to assault Maldonado because Maldonado was testifying in federal court.

To be sure, the evidence that the Defendant intended to assault Maldonado for testifying in federal court is entirely circumstantial. But "as a general rule most evidence of intent is circumstantial." *United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998). It is for that reason that "a finding of [intent] that is largely inferential is not impermissible."

12

*United States v. Sheiner*, 410 F.2d 337, 340 (2d Cir. 1969) (discussing circumstantial proof of knowledge). Indeed, even if the jury *could* have inferred that the Defendant lacked the specific intent required by § 1513(b)(1), the Court would still be required to deny his Rule 29 motion: "The possibility that inferences consistent with innocence as well as guilt might be drawn from circumstantial evidence is of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose amount competing inferences." *MacPherson*, 424 F.3d at 190 (quotation marks omitted). Viewing the evidence as a whole and in the light most favorable to the Government, there was enough evidence for a reasonable jury to conclude that the Defendant had the intent required by § 1513(b)(1).

For these reasons, the Defendant's motion for judgment of acquittal is denied.

### B. The Defendant's Rule 33 motion

Rule 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[B]y its terms," Rule 33 provides district courts with "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quotation marks and ellipsis omitted). The fundamental question underlying a Rule 33 motion is, then, straightforward, if not always easy to answer: whether "an injustice has been done." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). Put differently, to grant a Rule 33 motion, a court must have "a real concern that an innocent person may have been convicted." *Id*.

The Defendant makes two arguments for a new trial: (1) that the Court's jury instructions were erroneous in several ways; and (2) that the Court unduly restricted his

cross-examination of Hecht regarding taped phone calls in which Hecht made statements that were inconsistent with his trial testimony.

### 1. Jury instructions

The Defendant first argues that the Court's instruction on § 1513(b)(1) was "highly confusing and failed to adequately inform the jury about the law."  Docket No. 270 at 2. The Court instructed the jury that § 1513(b)(1) has three elements, the last of which is that "the defendant acted with intent to retaliate against Anthony Maldonado for his attendance at or his testimony given in an official federal proceeding, that is, the trial of *United States v. Jose Martinez*, 10-CR-233S."  Tr. 763:23 – 764:2.

The Defendant objects to the way in which the Court explained the third element of § 1513(b)(1) to the jury.  The Court's instruction on this element was as follows:

> The third element the government must prove beyond a reasonable doubt is that the defendant acted with intent to retaliate against Anthony Maldonado for his attendance at or his testimony given in any official federal proceeding.  An official federal proceeding includes a criminal proceeding before a federal court or a federal judge.  You are instructed that the case of *United States v. Martinez*, 10-CR-233S, is an official federal proceeding. To satisfy this element, the government must prove that the defendant intended to retaliate against Anthony Maldonado for his testimony in the specific official federal proceeding.  However, the government need not prove that the defendant had knowledge of the case name and the case number for the particular official federal proceeding, nor to satisfy this element, it is not necessary for the government to prove that the defendant knew that he was breaking any particular law.  Tr.  764:20 – 765:2.[7]

---

[7]  The Court's written instruction stated that "the government must prove beyond a reasonable doubt . . . that the defendants acted with the intent to retaliate against Anthony Maldonado for his attendance at, or his testimony given in, *an* official federal proceeding."  Ct. Ex. 3-A (Docket No. 240) at 68 (emphasis added).  The transcript of the Court's charge, however, shows that the Court's oral delivery of the instruction was slightly different: The Court instructed the jury that the Government must prove that the Defendant intended

The Defendant argues that this instruction was confusing because it left the "jury . . . with the task of figuring out whether the government had to prove that [the Defendant] intended the beating as retaliation for: 1) Maldonado's attendance at or testimony in *Martinez*, specifically; (2) Maldonado's attendance at or testimony in *any* 'official federal proceeding,' a term that went almost wholly undefined in the instructions; or 3) Maldonado's attendance at or testimony in *Martinez*, specifically, with the apparent caveat that *Martinez* had to be readily identifiable as the relevant specific official federal proceeding to and by the jurors, but not to and by [the Defendant] himself." Docket No. 270 at 4.

The Defendant also argues that the Court's instruction on the third element of § 1513(b)(1) was erroneous because it instructed the jury that, as a matter of law, *United States v. Martinez* was an "official proceeding," as that term is defined in 18 U.S.C. § 1515(a)(1)(A). The Defendant argues that this instruction deprived him of his Sixth Amendment right to have a jury find every element of the offense charged.

"A party who objects to any portion of the [jury] instructions . . . must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). *See Elonis v. United States*, 135 S. Ct. 2001, 2017 (2015) ("An objection cannot be vague or open-ended. It must *specifically* identify the alleged error.") (emphasis in original). A party's failure to timely object to a proposed jury charge "precludes appellate review, except as permitted under Rule 52(b)['s]" plain-error

---

to "retaliate against Anthony Maldonado for his attendance at or his testimony given in *any* official federal proceeding." Tr. 764:22-23 (emphasis added). After the Court finished reading its charge, the Court excused the jury, noted that "the objections you made previously are preserved for the record," and asked whether there was "[a]nything further?" Tr. 777:6-11. Neither party noted this discrepancy between the Court's written and oral instructions.

standard.  Fed. R. Crim. P. 30(d).  The Defendant did not raise the objections he now makes during the charge conference, nor did he raise them in the written objections he filed before trial.  *See* Tr. 639:9 – 648:24 (charge conference); Docket No. 210 (pre-trial objections).

Thus, the Court reviews the Defendant's objections only to determine whether they raise "[a] plain error that affects substantial rights."  Fed. R. Crim. P. 52(b).[8]  The Defendant must therefore show that there was "(1) error, (2) that is plain, and (3) that affects substantial rights.  If all three conditions are met, [the] . . . [C]ourt may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quotation marks, brackets, and citation omitted).

### a. Whether the Court plainly erred in how it instructed the jury on the third element of § 1513(b)(1)

"Error" for purposes of plain-error review means "[d]eviation from a legal rule." *United States v. Olano*, 507 U.S. 725, 732-33 (1993).  "'A jury instruction is erroneous if it misleads [the] jury as to the correct legal standard or does not adequately inform the jury on the law.'  [The] review of jury charges is holistic—[the Court] do[es] not examine words or phrases in isolation, but rather in the context of the entire charge."  *United States v. Thompson*, 263 F. App'x 158, 159-60 (2d Cir. 2008) (quoting *United States v. Pimentel*, 346 F.3d 285, 301 (2d Cir. 2003)).

---

[8] "Although Rule 52(b) is commonly invoked by counsel who, on appeal, discover an error to which they previously failed to object, the rule 'is not so limited.'"  *United States v. Lawhorne*, 29 F. Supp. 2d 292, 313 (E.D. Va. 1998) (quoting 3A Charles A. Wright, *Federal Prac. & Proc.* § 856, at 338 (2d ed. 1982)).  *See also United States v. Washington*, 263 F. Supp. 2d 413, 426 n.7 (D. Conn. 2003) ("[I]n light of Fed. R. Crim. P. 1(a)(1), there is no reason to conclude that Rule 52(b) would not govern a Rule 33 motion.  Thus, in reviewing defendant's claims of prosecutorial misconduct for the first time on his Rule 33 motion, this Court performs somewhat of an appellate role and thus the plain error analysis will be used here.")

The Court assumes, only for purposes of resolving the Defendant's Rule 33 motion, that the Court's instruction on the third element of § 1513(b)(1) was erroneous. That assumed error, however, was not "plain." "An error is 'plain' if it is 'clear' or 'obvious' at the time of [the reviewing court's] consideration. Put another way, an error is 'plain' if it is so egregious and obvious that a trial judge and prosecutor would be derelict in permitting it in a trial held today." *United States v. Thomas*, 274 F.3d 655, 667 (2d Cir. 2001) (*en banc*) (quoting *Johnson*, 520 U.S. at 467-68; other quotation marks omitted). Conversely, then, an error is not "plain" if it is "subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

Even if the Court's instruction on the third element of § 1513(b)(1) was erroneous, that error was not "clear" or "obvious." To the contrary, any error was in the particular wording—not the substance—of the Court's charge. A legally-correct jury charge, however, need not contain any "particular form of words." *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007). Thus, it would be difficult to show—and the Defendant has not shown—that any error in how the Court phrased its jury charge would be "subject to reasonable dispute." *Puckett*, 556 U.S. at 135.

### b. Whether the Court's plainly erred in instructing the jury on the term "official proceeding"

The Court assumes, only for purposes of resolving the Defendant's Rule 33 motion, that it was error to instruct the jury that "*United States v. Martinez*, 10-CR-233S, is an official federal proceeding," as that term is defined by 18 U.S.C. § 1515(a)(1)(A). The Court also assumes that that assumed error was "plain." Even with these assumptions, however, the Defendant is not entitled to relief because he has not shown that the assumed error "'affect[ed] [his] substantial rights.'" *United States v. Olano*, 507

17

U.S. 725, 734 (1993).  That is, he has not shown that the assumed error "affected the outcome of the [trial]."  *Id.*

Even if he tried to, the Defendant could not make this showing.  No reasonable jury could have concluded that *United States v. Martinez* was anything but "a proceeding before a judge or court of the United States."  18 U.S.C. § 1515(a)(1).  The case's name— *United States v. Martinez*—would be enough for a reasonable jury to make that finding. And, moreover, the Assistant United States Attorney who prosecuted *Martinez* testified that the trial was "held in U.S. District Court, here in Buffalo, [in] the adjoining courtroom in front of the Honorable William Skretny."  Tr. 86:2-4.  In light of this evidence, the Defendant cannot show that he was prejudiced by any error in instructing the jury that *United States v. Martinez* was an "official proceeding."  He therefore cannot show that any error affected his substantial rights.

### 2.  Restrictions on cross-examination

The Defendant next argues that the Court unduly limited his cross-examination of Hecht and his ability to impeach Hecht with Hecht's allegedly-inconsistent prior statements.  This argument arises from the Defendant's attempt to introduce tape recordings of a number of jailhouse calls between Hecht and his girlfriend.  In some of the calls, Hecht suggested that he assaulted Maldonado because he had had a "bad day." Defense counsel sought to introduce the taped calls as prior inconsistent statements because Hecht testified at trial that he had committed the beating at the Defendant's request.

The Court allowed defense counsel to play excerpts of the calls as extrinsic evidence of a prior inconsistent statement,[9] and the Court allowed defense counsel to engage in limited cross-examination concerning the allegedly-inconsistent statements in those tapes.  The Court, however, directed defense counsel to "[g]o to the next tape" or to "[p]lay the next tape" once the allegedly-inconsistent statements had been played.  Tr. 602:15-16; 605:10.  After defense counsel played several tapes, the Court precluded defense counsel from playing any further tapes, concluding that "[t]his is getting cumulative," Tr. 607:19-20, and that the inconsistent statement the Defendant sought to draw out with an additional tape excerpt was "collateral." Tr. 609:19.

The Defendant raises two related arguments concerning this course of events.  He first argues that the Court improperly limited his ability to play the tapes, thereby depriving him of the ability to "confront[] Hecht with [Hecht's] own, frequently repeated, dissonant version of events, . . . using Hecht's own voice."  Docket No. 270 at 8.  Second, the Defendant argues that the Court unreasonably limited his ability to "pepper[]" Hecht about his statements in the tapes.  *Id.  See also id.* at 7 ("Defense counsel planned to parade Hecht's true colors by, among other things, vigorously cross-examining him about statements he made to several people over several days in several phone calls that were recorded by the Cattaraugus County Jail.")  Neither argument entitles the Defendant to a new trial.

The Defendant's arguments must be considered against the backdrop of Hecht's entire cross-examination.  *Before* the tapes were played, Hecht acknowledged—multiple times—that his trial testimony was inconsistent with statements he had made during his

---

[9]  *See* Fed. R. Evid. 613(b); Tr. 605:10-11; Tr. 606:3-4.

first interview with DEA agents and during several subsequent phone calls.[10]  The Court

then allowed defense counsel to play excerpts from four tapes containing, in substance,

---

[10]  To show the extent to which the Defendant was able to cross-examine Hecht about his prior inconsistent statements before playing the tapes, the Court quotes the trial transcript at length:

Q: Okay.  Now, on direct, I believe you testified that you initially told agents investigating this assault that you beat Mr. Maldonado because he said something to you, right?
A: That's correct.
Q: And your story today is that you beat up Mr. Maldonado because Mr. Cotto told you to, in exchange for Latin King protection?
A: That's correct.
Q: But the story that you beat up Mr. Maldonado because you were just having a bad day and he said something is the truth; isn't that right?
A: That's not the truth.
Q: That's what you told the DEA agents when they first met you, right?
A: That's right.
Q: That's what you told several people in several jail calls that you made within a week after the assault, right?
A: No, it isn't.

                         *         *         *

Q: And you told [your girlfriend], on May 28th, 2014, less than a week after the assault, that Detective Rice took you upstairs at the jail, right?
A: That's correct.

                         *         *         *

Q: [A]nd you told them that you—you told [your girlfriend] that you told them that you beat up Mr. Maldonado because you were having a bad day, right?
A: Correct.
Q: And you told her that the agent, Detective Rice and the DEA agent, they're trying to go a whole other way with it, right?
A: That's correct.

                         *         *         *

Q: You told her you had a bad day with the wrong person, right?
A: That's correct.
Q: And you had a bad day, because you were worried about your legal problems, right?
A: That's what I said at first.
Q: You had a bad day because your girlfriend was having issues with her ex, right?
A: That's right.
Q: Your mom didn't visit you, right?
A: Correct.
Q: You were having a bad day and anybody could have gotten it that day; isn't that right?
A: That's what I said.
Q: That's what you told your girlfriend less than a week after the assault.
A: At that point, yes.  That was before I had the second meeting with the DEA agents and realized how much time I was facing.

                         *         *         *

Q: Meaning you could have jumped on anyone that day, right?
A: That's what I had said.

Tr. 585:9 - 588:23.

the same inconsistent statements that Hecht had just admitted making. *See* Def. Ex. 3A at 0:00 – 2:47[11]; Def. Ex. 3B at 0:06 – 6:45[12]; Def. Ex. 3C at 8:58 – 10:59[13]; Def. Ex. 3D at 0:00 – 1:47.[14]  Likewise, co-Defendant Escalera vigorously cross-examined Hecht

---

The Defendant asked Hecht similar questions after playing the second tape:

Q: . . .  You told this person [on a phone call], right off the bat, that you were in isolation for breaking someone's jaw, right?
A: That's correct.
Q: Because you were having a really bad day?
A: Correct.  And the reason why I said that on the phone is because they monitor my phone calls.
Q: All right.  And your girlfriend—you were having a bad day because your girlfriend couldn't come visit you, right?
A: That's correct.
Q: Your mom couldn't come visit you, right?
A: My mom wouldn't come visit me.
Q: Your mom wouldn't come visit you.  And now, this is at least the third person who you said you assaulted Mr. Maldonado because you were having a bad day, right?
A: That was the cover story.
Q: You're saying now it's a cover story, but back on May 30th, you didn't say anything about it being a cover story to this person on the phone, right?
A: Actually, I had said that before, it was a cover story.  I didn't come out with the regular story until after I was pressed by DEA agents the second time, which was after May 30th.

Tr. 603:13-604:10.

[11] "[T]hey tried to go some whole other way with this shit, like he tried to say some whole other shit and I'm trying to tell them, listen, I just had a bad day, that's all it was. . . .  I guess I had a bad day with the wrong person, you could say. . . .  But like I told him, I'm like, listen, man, I don't—I don't know about any of that other shit, but all I know is that I was having a bad day, like (inaudible) my shit, my legal shit.  I'm like, no, my girl was having a bad day with her ex that day.  I'm like, I asked my mom to come visit me in a day and she didn't show up.  It was just a bad day.  Like, you know, basically anybody could got it that day."

[12] "[T]he person that I got into a fight with is a federal inmate . . . .  So they—like, I don't know, they assumed that I knew that's what it was and I was trying to tell them, like you know what I mean, I was just having a bad day—you don't even know.  They—like they try telling me I'm going to get 30 years if they find out that it's—you know what I mean? . . . .  Like I tried to tell them, listen, I was having a bad day.  I said, anybody coulda got a bad day, even (inaudible) coulda got a bad day.  You know what I mean?  Like it was just a bad day for me and that person just picked a bad day to say the wrong thing to me. . . .  I'm in a fucked up predicament sitting here."

[13] "Yeah, I had a rough week last Friday. . . .  Yeah, I took it out on somebody 'cause he said some stupid shit . . . [T]hey think I did it on purpose.  They think somebody had me do it like and I'm like—I'm trying to tell them, like, listen, man, it was just a fucking bad day, you know what I mean, like it could have been anybody that day."

[14] "Oh, I was having a bad day.  You know me and my bad days. . . .  Yeah, but, listen, though, all right, he fucking—he said something to somebody.  He told somebody else—asked somebody else why I was on his (inaudible) and I'm like—I was having a really bad day, (inaudible) my issues with my family and everything and I asked my—'cause my girlfriend couldn't come that day to visit me, like the whole week, so

about his many inconsistent statements, at one point getting Hecht to admit that he had lied "20 or 30" times "about this event."[15]

The Defendant has not shown that continuing to play tape excerpts, or cross-examining Hecht about those excerpts, would do anything other than provide even more material with "which to impeach [a] prosecution witness[] whose credibility had already been vigorously challenged." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (addressing newly-discovered impeachment evidence). In other words, it is difficult to discern how allowing the Defendant to play two additional tape excerpts with inconsistent statements would have led the jury—after hearing Hecht admit multiple times that he had lied about the events in this case—to conclude that Hecht's testimony was not truthful.

Thus, precluding the Defendant from playing two additional tape excerpts and further cross-examining Hecht about those excerpts does not convince the Court that "an innocent man may have been convicted." *Sanchez*, 969 F.2d at 1414. *Cf. United States v. Gambino*, 59 F.3d 353, 366 (2d Cir. 1995) ("Nondisclosure of cumulative evidence tending only to further impeach a witness' general credibility is not grounds for granting a Rule 33 motion."); *United States v. Gordils*, 982 F.2d 64, 72 (2d Cir. 1992) ("Newly discovered evidence does not warrant a new trial unless the evidence is so material and

---

I asked her to ask my mom since she was going by to come visit me and she didn't come, either, so I was in a really bad mood."

[15] *See* Tr. 611:13 – 25 (Q: So, the very first words out of your mouth to law enforcement, before you were facing a federal crime, was a lie; yes or no? . . . A: I had told law enforcement that—the story that I had made up, yes. . . . Q: So you're lying right out of the box? A: That's correct."); Tr. 613:18 – 613:5 (Q: So, you told the police that you were having a bad day? A: I told the police that that's what it was and I was having a bad day and anybody could get beat up that day. Q: Now, how many police did you lie to that first day? A: Two. Q: And how long did you lie for? A: Until the next time I went in for an interview. Q: Now, when you were on the phone, those were all lies, too? A: They were all lies. Q: Okay. So you just heard 20 or 30 lies you just said about this event? A: That's true.)

non-cumulative that its admission would probably lead to an acquittal.") (quotation marks omitted).[16]  The Defendant's motion for a new trial on that basis is therefore denied.

## CONCLUSION

For the reasons stated above, the Defendant's motion for judgment of acquittal (Docket No. 269) and his motion for a new trial (Docket No. 270) are both denied.

Sentencing is scheduled for June 28, 2018 at 1:00 p.m.  By separate order, the Court will set dates for the filing of all sentencing papers.

**SO ORDERED.**


Dated: May 29, 2018                                    _s/Richard J. Arcara_____
, New York                                                  HONORABLE RICHARD J. ARCARA
                                                                 UNITED STATES DISTRICT JUDGE

---

[16]  This is particularly true given that the subject of much of Hecht's cross-examination—the reason why he beat Maldonado—is irrelevant to the Defendant's liability under 18 U.S.C. § 2(b).